IN THE DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| Patrick Ervin, on behalf of himself and other members of the putative class, <br><br> Plaintiff, <br><br> v. <br><br> TD Ameritrade, Inc., TD Ameritrade Clearing, Inc., and TD Ameritrade Holdings Corp., <br><br> Defendant. | Case No. 20-cv-0266-BP |

## MOTION FOR LEAVE TO FILE FIRST AMENDED CLASS ACTION COMPLAINT AND SUGGESTIONS IN SUPPORT

BARTLE & MARCUS LLC

David L. Marcus, MO Bar #47846
116 W. 47th Street, Suite 200
Kansas City, MO 64112
Telephone: 816.256.4699
Fax: 816.222.0534
Dmarcus@bmlawkc.com

LAW OFFICE OF JARED A. ROSE

Jared A. Rose, MO Bar #60128
919 West 47th Street
Kansas City, MO 64112
Telephone: 816.221.4335
Fax: 816.873.5406
jared@roselawkc.com

*ATTORNEYS FOR PLAINTIFF*

# **TABLE OF CONTENTS**

Suggestions .................................................................................................................. 1

    I.     Preliminary Statement ................................................................................ 1

    II.    Argument .................................................................................................... 3

          A. Legal Standards ................................................................................. 3

          B. Overview of Proposed Amendments ............................................... 3

               1. Modifications to Count 1 ............................................................ 4

               2. The Inclusion of Facts from the Deposition of TD Ameritrade's Corporate Representative .............................................................. 5

               3. Modifications to the Class Definition ........................................ 6

               4. The Deletion of Count III ........................................................... 7

               5. The Deletion of Extraneous Allegations ................................... 8

               6. The Addition of New Count III .................................................. 8

Conclusion ................................................................................................................ 13

# **TABLE OF AUTHORITIES**

Cases

*Bradford v. Dana Corp.,*
    249 F.3d 807 (8th Cir. 2001) ............................................................... 3

*COR Clearing, LLC v. Calissio Resources Group, Inc.,*
    Case No. 8:15CV317, 2017 WL 5157607 (D.Neb. Nov. 6, 2017) ............ 9

*Ellingsworth v. Vermeer Mfg. Co.,*
    949 F.3d 1097 (8th Cir. 2020) ............................................................ 3

*Foman v. Davis,*
    371 U.S. 178 (1962) ............................................................................. 3

*Janson v. LegalZoom.com, Inc.,*
    271 F.R.D. 506 (W.D.Mo. 2010) ......................................................... 7

*Silva v. Metropolitan Life Ins. Co.,*
    762 F.3d 711 (8th Cir. 2014) ............................................................... 3

Statutes

15 U.S.C. § 78c ............................................................................................. 9

17 C.F.R. § 240.15c3-3 ............................................................................. 9, 13

17 C.F.R. § 242.200 .................................................................................... 11

26 C.F.R. § 1.6045-2 ........................................................................ 11, 12, 13

Fed R. Civ. P. Rule 15 ................................................................................. 1, 3

Fed. R. Civ. P. Rule 16 ................................................................................ 1, 3

R.S.Mo. § 400.8-503 ..................................................................................... 9

R.S.Mo. § 400.8-505 ................................................................................. 8, 10

U.C.C. § 8-505 .............................................................................................. 8

Other Authorities

David Brooks, *Depository Trust Company and the Omnibus Proxy: Shareholder*
    *Voting in the Era of Immobilization,* 56 S. Tex. L. Rev. 205 (2014) ........ 9

Pursuant to Rules 15(a)(2) and 16(b) of the Federal Rules of Civil Procedure, Plaintiff Patrick Ervin ("Plaintiff") moves this Court for leave to file his First Amended Class Action Complaint in the captioned cause. Amendments of the pleadings are common in complex cases such as this one, and this is the first and only time an amendment has been sought by Plaintiff. Although this proposed amendment comes after the deadline for amending the pleadings, there is good cause for the amendment. Defendants recently put at issue key facts that heretofore had been uncontested. Further, as a result of class certification discovery that took place just within the last two months—in particular the deposition of Defendant's corporate representative—Plaintiff is better able to understand and articulate the wrongdoing at issue. The proposed First Amendment Class Action Complaint is attached hereto as <u>Exhibit A</u>.

In further support of Motion, Plaintiff submits the following Suggestions.

## **SUGGESTIONS**

**I.      PRELIMINARY STATEMENT**

The original Class Action Complaint filed in this matter asserted five causes of action against TD Ameritrade:

- Count I: Breach of Contract (Losses Resulting from Hypothecation);
- Count II: Breach of Contract (Failure to Provide Credit);
- Count III: Breach of Contract (Failure to Provide Gross Up);
- Count V[1]: Unjust Enrichment; and
- Count VI: Declaratory Judgment.

On March 4, 2021, TD Ameritrade received leave to withdraw certain admissions it made pertaining to the first of these causes of action. *Order Granting Motion to Amend Admissions*

---

[1] The designation of this as Count V was a clerical error. The original Class Action Complaint did not include a Count IV.

1

(Doc. 75). At the outset of the litigation, TD Ameritrade admitted that it borrowed and loaned out an exchange-traded fund identified by the ticker symbol "VMOT" from Plaintiff's margin account. TD now disputes borrowing and loaning out this security. This is significant because the term "hypothecation" is often used synonymously with loaning out securities. As a result, TD Ameritrade's admission that it borrowed and loaned out VMOT helped establish one of the elements of Count I. Without this admission, Plaintiff will be required to prove this element at trial.

The withdrawal of these admissions also is significant because the parties' contract only authorizes TD Ameritrade to make a substitute payment to Plaintiff in lieu of dividends when it borrows securities. If TD Ameritrade did not borrow and loan out VMOT, then it should not have made a substitute payment to Plaintiff in lieu of the VMOT dividend paid to shareholders on April 1, 2019. It breached the parties' contract by doing so.

The proposed First Amended Class Action Complaint addresses these issues and makes certain other amendments to conform to evidence that came to light after the deadline for amending the pleadings had passed, when Defendants changed their admissions and during the testimony Defendants relied upon in order to change those admissions. In addition, the proposed First Amended Class Action Complaint also deletes certain extraneous allegations which serve merely as background information and do not directly relate to Plaintiffs' claims. There is good cause for these amendments and they will further, rather than frustrate, the resolution of this dispute on the merits.

## II. ARGUMENT

### A. <u>Legal Standards</u>

When a party seeks to amend the pleadings after the court-ordered deadline for amendments has passed, he or she must show good cause under Rule 16(b). Fed.R.Civ.P. 16(b)(4); *Ellingsworth v. Vermeer Mfg. Co.*, 949 F.3d 1097, 1100 (8th Cir. 2020). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Bradford v. Dana Corp.*, 249 F.3d 807, 809 (8th Cir. 2001)(citations omitted). The Court also considers any prejudice to the non-moving party. *Id*.

If the Court finds good cause exists under Rule 16(b), it next considers whether the amendment is proper under Rule 15(a)(2). *See, e.g., Silva v. Metropolitan Life Ins. Co.*, 762 F.3d 711, 719-28 (8th Cir. 2014) (affirming the district court's finding that good cause under Rule 16(b)(4) existed for the post-deadline motion to amend and reversing the district court's finding that the proposed amendment was futile under Rule 15(a)(2)). Under Rule 15(a)(2), "'[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief,' leave to amend a complaint is freely given in order to provide the plaintiff the opportunity to test the claim in the amended complaint on the merits." Fed.R.Civ.P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962).

### B. <u>Overview of Proposed Amendments</u>

The primary reason Plaintiff seeks to amend his pleadings is because TD Ameritrade withdrew certain admissions pertaining to Count I of the original Class Action Complaint and put at issue facts that previously had been uncontested. This materially impacted the nature of the claim and the sort of proof needed to establish it. It also gave rise to a new cause of action

3

that did not appear to exist when this case was first filed. Had TD Ameritrade not withdrawn its admissions, Plaintiff would not now be seeking leave to make these or any other amendments.

At the same time, considerable discovery took place after the deadline for amending the pleadings had passed. This discovery included the deposition of TD Ameritrade executives Jeffrey Mundt (produced in his individual capacity and as a corporate representative) and John Templeton. TD Ameritrade used the testimony from these depositions as support for withdrawing its admissions. *Reply Suggestions in Support of Defendants' Motion to Withdraw Admissions* (Doc. 74), at 5-6. In preparing his proposed First Amended Class Action Complaint, Plaintiff used testimony from these same depositions to better define the acts and events at issue. This information was unavailable until just this January.

Besides the foregoing, Plaintiff proposes certain other amendments to conform his allegations to the evidence and sharpen the focus of this lawsuit. The crux of the case remains the same as it was before: TD Ameritrade failed to compensate accountholders for the difference in tax treatment between substitute payments and qualified dividends. Now, however, Plaintiff knows the reason for this failure and how it impacted him and other members of the putative class.

The following is an overview of these changes and a concise explanation of each change:

1. <u>Modifications to Count I</u>

Count I of the First Amended Class Action Complaint is based upon the same contractual provision as Count I of the original Class Action Complaint. That provision states in pertinent part as follows:

> The value of the securities and other property that you may pledge, repledge, hypothecate, or re-hypothecate may be greater than the amount I owe you, and any losses, gains or compensation that result from these activities will not accrue to my Account.

*TD Ameritrade Account Agreement*, § 11g, attached as Exhibit A to the Class Action Complaint (Doc. 1-1).

The original Class Action Complaint paraphrased this language to focus solely on hypothecation, since the term "hypothecation" often is used synonymously with the term "loan", and it seemed clear TD Ameritrade borrowed and loaned out securities from Plaintiff's account. Indeed, TD Ameritrade admitted borrowing securities from Plaintiff's account until recently, when it obtained leave to withdraw its admissions and put this matter at issue.

Plaintiff continues to believe TD Ameritrade borrowed and loaned out securities from Plaintiff's account. But the contract provision at issue does not depend on TD Ameritrade borrowing and loaning out securities from Plaintiff's account. The provision is broader than this, applying whenever securities have been pledged, repledged, hypothecated and/or rehypothecated. The First Amended Class Action Complaint includes the actual contract language to make the scope of Plaintiff's claim clear. Plaintiff intends to show that in every instance where TD Ameritrade made a substitute payment, securities were been pledged, repledged, hypothecated and/or rehypothecated.

2. <u>The Inclusion of Facts from the Deposition of TD Ameritrade's Corporate Representative</u>

The deposition of TD Ameritrade's corporate representative, Jeffrey Mundt, occurred on January 12, 2021 (the day before John Templeton's deposition). In Jeffrey Mundt's deposition, Plaintiff learned for the first time why he was not compensated for the tax difference between substitute payments and qualifying dividends.

TD Ameritrade generally compensates customers for the tax difference between substitute payments and dividends—TD Ameritrade calls this compensation a "premium payment"— so long as the substitute payment is in lieu of a qualifying dividend. *Mundt Depo.*,

5

51:19-52:10, 68:10-69:5, attached hereto as Exhibit B. To determine whether a dividend is qualifying, TD Ameritrade examines how the dividend is characterized by the issuer ***at the time of payment***. *Id.*, 56:18-57:21, 84:22-86:15. If the dividend is characterized as ordinary at the time of payment, TD Ameritrade treats the dividend as ordinary, and no premium payment is made. *Id.* The problem is that issuers can and often do change the tax characterization of distributions ***after the time of payment***. *Id.*, 73:24-74:3. This is known as "income reallocation," and can result in ordinary dividends becoming qualifying dividends on the IRS Form 1099. *Id.*, 77:21-78:13.

That is exactly what happened to Plaintiff. The VMOT dividend originally was characterized as ordinary but later changed to qualifying. *Id.*, 153:10-154:15. TD Ameritrade failed to recognize this change and therefore failed to make a premium payment to Plaintiff's account. *Id.* 155:15-156:25, 166:19-25. This is a systemic problem; TD Ameritrade's automated system does not consider income reallocation in determining whether a premium payment is due. *Id.*, 82:22-84:6, 86:5-14.

The First Amended Class Action Complaint spells out this systemic problem so as to put TD Ameritrade on notice as to the specific conduct being challenged. Plaintiff did not possess this information until January 12, 2021, long after the deadline for amending the pleadings had passed. The original Class Action Complaint alleges that Plaintiff failed to receive compensation for the tax difference between substitute payments and qualifying dividends but does not allege a reason for this failure.

   3.  <u>Modifications to the Class Definition</u>

The class definition was modified to better define the time period encompassed by the class by adding a precise beginning date. In addition, the word "hypothecated" was removed because none of Plaintiff's causes of action depend on securities being hypothecated. Count I is

based on securities being pledged, repledged, hypothecated and/or rehypothecated and the evidence will show that at least one of these activities occurs every time a substitute payment is made, so the class for Count I should include anyone who received a substitute payment without also receiving a premium payment. Counts II, IV and V of the proposed First Amended Complaint depend on class members receiving a substitute payment without also receiving a premium payment regardless of what happened with the underlying securities. Count III depends on class members receiving a substitute payment without securities being borrowed and loaned out.

There is good cause for these amendments. TD Ameritrade did not originally contest that securities were borrowed and loaned out of Plaintiff's account. Therefore Plaintiff's original proposed class definition, which would look at whether securities were borrowed and loaned out of customer accounts (with the terms "hypothecation" and "loan" used synonymously with one another), did not require a merits determination. Now that TD Ameritrade contests whether it borrowed and loaned out Plaintiff's securities, the class definition in the original Class Action Complaint would predicate class membership on a merits determination. This is improper. *Janson v LegalZoom.com, Inc.*, 271 F.R.D. 506, 512 (W.D. Mo. 2010) (observing class definition is improper if class membership requires a merits determination). Defendants' withdrawn admissions necessitate a new class definition, and the class definition has been changed accordingly.

    4.  <u>The Deletion of Count III</u>

Count III in the original Class Action Complaint was based upon TD Ameritrade's failure to "gross up" the amount of its premium payment to compensate for the fact that the premium payment is taxable. Plaintiff has not found any evidence this is occurring. Instead, the evidence suggests that when TD Ameritrade does make a premium payment, it always grosses up the

premium payment to account for taxes. Accordingly, Plaintiff has deleted Count III from the proposed First Amended Class Action Complaint.

        5.        <u>The Deletion of Extraneous Allegations</u>

The original Class Action Complaint contained several allegations that served merely as background information and did not directly relate to Plaintiff's claims. Plaintiff hypothesized, for example, about the impact of receiving substitute payments on an accountholder's investment returns. *Class Action Complaint*, ¶¶ 41-45. TD Ameritrade seized on these allegations to argue that Plaintiff's claims sounded in fraud, were preempted by the Securities Litigation Uniform Standards Act, and should be dismissed. *Suggestions in Support of Motion to Dismiss* (Doc. 14), at 14-15. The Court rejected this argument and declined to dismiss Plaintiff's claims. *Order on Motion to Dismiss* (Doc. 33). In the unlikely event this case ends up before the Eighth Circuit, TD Ameritrade will no doubt seize on these same allegations to make these same arguments. The First Amended Complaint deletes these extraneous allegations to make it absolutely clear that Plaintiff is asserting claims for breach of contract and not fraud. To include these extraneous allegations in a new pleading might create the false impression that they do in fact relate to Plaintiff's claims.

        6.        <u>The Addition of New Count III</u>

Fundamentally, a person who owns shares in a company is entitled to any dividends paid on those shares. *See* R.S.Mo. § 400.8-505 (codifying U.C.C. § 8-505, "Duty of securities intermediary with respect to payments and distributions"); U.C.C. § 8-505, cmt. 1 ("One of the core elements of the securities account relationships for which the Part 5 rules were designed is that the securities intermediary passes through to the entitlement holders the economic benefit of ownership of the financial asset, such as payments and distributions made by the issuer."); *COR Clearing, LLC v. Calissio Resources Group, Inc.*, Case No. 8:15CV317, 2017 WL 5157607, at

*8-9 (D. Neb. Nov. 6, 2017)(discussing stock ownership rights under the U.C.C.). This is part of the bundle of rights attendant to being a shareholder. *Id.*; *see also* R.S.Mo. § 400.8-503(b)("An entitlement holder's property interest with respect to a particular financial asset under subsection (a) is a pro rata property interest in all interests in that financial asset held by the securities intermediary"); David Brooks, *Depository Trust Company and the Omnibus Proxy: Shareholder Voting in the Era of Immobilization*, 56 S. Tex. L. Rev. 205, 217-22 (2014) (discussing rights of securities holders). Shareholders can cede certain of these rights to the brokerage firm that holds their shares[2] in exchange for consideration, such as the ability to borrow on margin, but this must be spelled out in the brokerage agreement between the shareholder and the firm and is limited by applicable federal regulations.

TD Ameritrade's Client Agreement generally authorizes it to borrow and loan out securities held in its customer margin accounts. *See TD Ameritrade Account Agreement*, § 11h, attached as Exhibit A to the Class Action Complaint (Doc. 1-1). Federal regulations limit this authority, however, to situations where the customer has expressly agreed in writing to the loan, or the customer has a margin balance (i.e., has taken out a margin loan from the brokerage firm and not yet repaid it). 17 C.F.R. § 240.15c3-3(a)(5), (b)(1) & (b)(3). Where a margin balance exists, the brokerage firm can borrow and loan out securities equal to 140 percent of that balance. *Id.*; *see also Deposition of John Templeton* ("*Templeton Depo.*"), 49:17-50:3, attached hereto as Exhibit C. The remaining securities must be segregated for the customer's exclusive use. *Id.*, 50:16-51:6

---

[2] Technically, shares are held at the Depository Trust Corporation in the brokerage firm's name. https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc ("In What Ways Can Investors Hold Interests in a DTC Eligible Security?"). Federal statutes define DTC as a "clearing agenc[y]." 15 U.S.C. § 78c(23)(A).

If a dividend is paid while a security is out on loan, the TD Ameritrade Client Agreement allows TD Ameritrade to make a substitute payment to the customer in lieu of the dividend he or she is entitled to receive. *TD Ameritrade Account Agreement*, § 11h, attached as Exhibit A to the Class Action Complaint (Doc. 1-1). The language of the TD Ameritrade Account Agreement is as follows: "I understand that in certain situations in which you have borrowed my securities, I may receive a 'payment in lieu' of the dividend issued." *Id.* The TD Account Agreement does not otherwise authorize TD Ameritrade to make a substitute payment in lieu of the dividend issued, and without this authorization, TD Ameritrade must pay the dividend to shareholder. *See* R.S.Mo. § 400.8-505(a)(1) (securities intermediary satisfies its duty to obtain a payment or distribution made by the issuer if it acts "<u>as agreed upon</u> by the entitlement holder and the securities intermediary.").

On March 4, 2021, TD Ameritrade obtained leave to withdraw its admission that it borrowed and loaned out shares of VMOT from Plaintiff's account. TD Ameritrade now disputes that it loaned out these shares. Yet, it is undisputed that on April 1, 2019, TD Ameritrade made a substitute payment to Plaintiff in lieu of VMOT dividends that were paid on that date. The problem is that if TD Ameritrade did not borrow Plaintiff's shares of VMOT, it had no authorization to make a substitute payment to Plaintiff in lieu of the VMOT dividend. Instead, the ***dividend*** should have been paid to Plaintiff.

> This passage from TD Ameritrade's Account Handbook is relevant in this regard:
>
> When a company declares a dividend, it establishes a date on which the **shareholders of record are entitled to receive the dividend**. This "record date" is established for the administrative purposes of the corporation. The first day a stock trades without the declared dividend is called the "ex-dividend day."
>
> On the ex-dividend day the opening price of the stock is adjusted to reflect the fact that shareholders are no longer entitled to receive the dividend payment. This is done by lowering the price of the security by the amount of the dividend. If you buy stock after the ex-dividend day, you have bought it without the dividend.

> If you sell stock on or after the ex-dividend day, ***you are entitled to receive the dividend***.³

*TD Ameritrade Account Handbook*, attached hereto as <u>Exhibit D</u> (emphasis added).

There is no dispute that Plaintiff sold his shares of VMOT on or after the ex-dividend date. Therefore, he was entitled to receive the VMOT dividend and not a substitute payment absent proof his shares were borrowed. If TD Ameritrade made a substitute payment to Plaintiff even though his shares of VMOT were not borrowed, it breached the parties' contract. New Count III alleges a new claim for breach of contract based on these facts.

*The Impact of Tax Reporting Regulations*

In recent briefing, TD Ameritrade seemed to suggest that tax reporting regulations authorized it to make a substitute payment to Plaintiff even when shares were not borrowed. *Reply Suggestions in Support of Defendants' Motion to Withdraw Admissions* (Doc. 74), at 3-4 & n. 2. This suggestion is false.

Because substitute payments are taxed at a different rate than qualified dividends, the IRS imposes certain requirements on brokerage firms regarding the reporting of such payments. These are contained in 26 C.F.R. § 1.6045-2. This regulation generally provides that when a brokerage firm borrows and loans out a customer's securities⁴ to facilitate a short sale and receives a substitute payment on the customer's behalf,⁵ the brokerage firm must disclose the

---

³ In previous briefing, TD Ameritrade lawyers placed undue emphasis on the record date, suggesting the record date determines which shareholders are entitled to receive dividends. This suggestion is misleading. As TD Ameritrade's Account Handbook explains, when it comes to buying and selling securities, the ***ex-dividend day*** is critical for determining who receives dividends. By holding a security until the ex-dividend day, a shareholder can preserve his or her right to receive the declared dividend.

⁴ The regulation uses the generic term "transfer," but given the context, this clearly refers to the borrowing and loaning out of securities. The regulation only applies to a broker that "transfers securities … for use in a short sale." 26 C.F.R. § 1.6045-2. And the term "substitute payment" is defined as "a payment in lieu of … [a] dividend, the ex-dividend date for which occurs during the period after the transfer of stock for use in a short sale, and prior to the closing of the short sale." 26 C.F.R. § 1.6045-2(a)(4)(i)(B) (emphasis added). By definition, a short sale involves the sale of ***borrowed*** securities. *See* 17 C.F.R. § 242.200(a).

⁵ The brokerage firm acts as an intermediary. It receives the substitute payment from the short seller and then pays it to the customer from whose account the borrowed shares originated.

11

substitute payment on the customer's IRS Form 1099. 26 C.F.R. § 1.6045-2(a) & (c). This is a simple requirement in situations where the brokerage firm has kept track of the specific shares that were transferred and the customer account(s) from which those shares originated. *See* 26 C.F.R. § 1.6045-2(f)(2)(i)(A). Where the brokerage firm has not kept track of some or all of the specific shares that were transferred, § 1.6045.2(f)(2)(ii) provides a four-step process the firm can use to allocate transferred shares:

- *First*, the brokerage firm identifies the universe of shares that are eligible to be deemed transferred shares. This universe is comprised of (a) shares that have been borrowed by the brokerage firm (the brokerage firm is able to identify specific shares that were transferred and the customer accounts from which they originated), and (b) shares that the brokerage firm is authorized by its customers to transfer (these are referred to as "loanable shares").

- *Second*, the brokerage firm allocates the transferred shares to any borrowed shares.

- *Third*, the brokerage firm allocates the transferred shares between two pools, one consisting of the loanable shares of all individual customers, and the other consisting of the loanable shares of all nonindividual customers. The transferred shares are allocated to the individual pool in the same proportion that the number of loanable shares held by individual customers bears to the total number of loanable shares available to the broker. Similarly, the transferred shares are allocated to the nonindividual pool in the same proportion that the number of loanable shares held by nonindividual customers bears to the total number of loanable shares available to the broker.

- *Finally*, within each pool, the brokerage firm selects which shares of which customers are deemed transferred shares. This can be done by a purely random lottery or on a first-in-first-out basis.

26 C.F.R. § 1.6045-2(f)(2)(ii).

This four-step process is not mandatory. It is one alternative to specifically identifying the record owner of the transferred stock. 26 C.F.R. § 1.6045-2(f)(2). Brokerage firms are free to use other methodologies with the prior approval of the Commissioner. *Id.* The only mandatory requirement is that in situations where 26 C.F.R. § 1.6045-2 applies, the firm must "make a determination of the identity of the customer whose stock was transferred and on whose

behalf the [firm] receive[d] substitute payments." *Id.* § 1.6045-2(f)(2). This determination must be made as of the record date of the distribution. *Id.*

TD Ameritrade has taken the position that Plaintiff received a substitute payment in lieu of VMOT dividends as a result of the methodology described in 26 C.F.R. § 1.6045-2(f)(2)(ii)(A). The problem with this argument is that as of the record date, Plaintiff had not authorized the transfer of his VMOT shares for use in a short sale.[6] Plaintiff had not been given advance notice that the VMOT shares would be loaned out and consented in writing to such loan, *see* 17 C.F.R. § 240.15c3-3(b)(3), nor was there a margin balance in his account on the record date to make such consent unnecessary. *Id.* § 240.15c3-3(a)(5) & (b)(1). As a result, his shares were not loanable and should not have been included within the pool of shares to which transferred shares could be allocated.[7] 26 C.F.R. § 1.6045-2(f)(2)(ii)(A).

Additional discovery will be necessary to understand exactly what happen with respect to Plaintiff's VMOT shares and the associated dividends to which he was entitled. At this point, there are sufficient facts to warrant amending the pleadings add a new Count III.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion should be granted and Plaintiff should be given leave to file the First Amended Class Action Complaint attached hereto as Exhibit A.

---

[6] *See* n. 4. While the regulation uses the generic term "transfer," this clearly refers to the borrowing and lending of securities. This is why securities that customers have authorized the brokerage firm to " transfer" are referred to as "loanable securities." 26 C.F.R. § 1.6045-2(f)(2)(ii)(A).

[7] This does not mean Plaintiff's shares were not loaned. Plaintiff's shares could have been loaned without his authorization on the record date or sometime after the record date when he incurred a margin balance. Plaintiff possessed an ownership interest in VMOT at least until April 1, 2019 when the dividend was paid because in selling his VMOT shares, he did not sell the right to the dividend associated with those shares.

13

Respectfully Submitted,

BARTLE & MARCUS LLC

By /s/ David L. Marcus
    David L. Marcus, MO Bar #47846
    BARTLE & MARCUS LLC
    116 W. 47th Street, Suite 200
    Kansas City, MO 64112
    Telephone: 816.256.4699
    Fax: 816.222.0534
    Dmarcus@bmlawkc.com

and

THE LAW OFFICE OF JARED A. ROSE

    Jared A. Rose, MO Bar #60128
    919 West 47th Street
    Kansas City, MO 64112
    Phone: 816.221.4335
    Fax: 816.873.5406
    jared@roselawkc.com

    **ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

       The undersigned certifies that on March 12, 2021, I served a copy of the foregoing document via this Court's CM/ECF System to the following:

Jason M. Hans
GERMAN MAY PC
1201 Walnut Street, 20th Floor
Kansas City, MO 64106
jasonh@germanmay.com

Stephen G. Topetzes
Theodore L. Kornobis
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Stephen.topetzes@klgates.com
Ted.kornobis@klgates.com

*Attorneys for Defendants*

                                            /s/ David L. Marcus
                                            *Attorney for Plaintiff*