**IN THE DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| **Patrick Ervin, on behalf of himself and other members of the putative class,** | |
|      **Plaintiff,** | **Case No. 20-cv-0266-BP** |
| **v.** | |
| **TD Ameritrade, Inc., TD Ameritrade Clearing, Inc., and TD Ameritrade Holdings Corp.,** | |
|      **Defendant.** | |

## FIRST AMENDED CLASS ACTION COMPLAINT

For his First Amended Class Complaint against TD Ameritrade, Inc., TD Ameritrade Clearing, Inc., and TD Ameritrade Holdings Corp. (collectively referred to herein as "TD Ameritrade"), Plaintiff Patrick Ervin ("Plaintiff") states and alleges as follows:

## INTRODUCTION

1.     This is an action for breach of contract, unjust enrichment and declaratory judgment.

## THE PARTIES

2.     Plaintiff Patrick Ervin ("Plaintiff") is a natural person residing in Jackson County in the State of Missouri.  At all times herein relevant, Plaintiff was trustee of The Patrick J. Ervin and Kathryn A. Ervin Revocable Living Trust, which owned a brokerage account at TD Ameritrade.  Plaintiff brings this action on behalf of himself and a class of similarly-situated individuals and entities as defined herein.

3.     Defendant TD Ameritrade, Inc., is a corporation organized under the laws of the State of New York, with its principal place of business at 200 S. 108th Ave., Omaha NE

1

68154, and is a wholly owned subsidiary of TD Ameritrade Holdings Corporation. It can be served with process through its registered agent at Incorporating Services, Ltd., 222 E. Dunklin, Suite 102, Jefferson City, MO 65101.

4.      Defendant TD Ameritrade Clearing, Inc., is a corporation organized under the laws of the State of Nebraska, with its principal place of business at 200 S. 108th Ave., Omaha NE 68154, and is TD Ameritrade's clearing broker-dealer. It can be served with process through its registered agent at Incorporating Services, Ltd., 222 E. Dunklin, Suite 102, Jefferson City, MO 65101.

5.      Defendant TD Ameritrade Holdings Corporation is a corporation organized under the laws of the State of Delaware, with its principal place of business at 4211 S. 102nd St., Omaha NE 68127. It can be served with process through its registered agent, Corporation Services Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this lawsuit was filed a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, the matter in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, the class consists of at least 100 members, Plaintiff and Defendants are citizens of different states, and no exception applies.

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391 because Plaintiff resides in this judicial district and because a substantial portion of the acts and conduct giving rise to the claims occurred in this judicial district.

# FACTUAL ALLEGATIONS

*The Basics of Investing*

8.      Investment securities such as stocks, bonds and exchange-traded funds typically are bought and sold through a brokerage firm.

9.      Buying or selling securities through a brokerage firm requires a brokerage account.

10.     A brokerage account is an arrangement where an investor deposits money with the firm and the firm make trades on the investor's behalf.

11.     Although the firm executes the orders, the assets belong to the investor, who typically must claim as taxable income any investment earnings.

12.     In general, there are two types of brokerage accounts: cash accounts and margin accounts.

13.     In a cash account, all transactions must be made with available cash or long positions. When buying securities in a cash account, the investor must deposit cash to settle the trade or sell an existing position on the same trading day, so cash proceeds are available to settle the buy order.

14.     In a margin account, the accountholder can borrow against the value of the assets in the account to purchase new positions or sell short. Margin also can be used to make cash withdrawals against the value of the account as a short-term loan. When a margin balance is created, the outstanding balance is subject to a daily interest rate charged by the brokerage firm.

15.     Although a margin account allows the accountholder to borrow against the value of assets in the account to purchase securities, this is a purely optional feature.  The accountholder may choose to utilize this feature periodically, regularly or not at all.  Even

3

where an accountholder has been approved for margin borrowing, he or she can continue to purchase new securities using the assets in his or her account rather than borrowing from the brokerage firm.

16.     Indeed, while a margin account can be viewed as a distinct type of brokerage account, it is equally accurate to view a margin account simply as a cash account with the added option of margin borrowing.

*Short Selling*

17.     One reason an investor may choose to open a margin account is to facilitate short selling.

18.     Short selling allows an investor to profit from the decline in the price of a particular security.

19.     To execute a short sale, an investor borrows stock through their brokerage company from someone who owns it. He or she then sells the stock, retaining the cash proceeds.

20.     The investor hopes that the price will fall over time, providing them an opportunity to buy the stock at a later date (up to the "expiration date") at a lower price than the original sale price. Any money remaining after buying back the stock is profit to the investor.

21.     By way of example, if an investor believes the price of ABC Company stock is going to decrease, he or she may borrow 10 shares of ABC at the current market price of $100 and sell it to another investor at that same time for that same market price. If the stock goes down to $90, the investor can buy the 10 shares back at $90. The short seller would then return the borrowed shares to the lender, who must accept the return of the same number of shares as was lent despite the fact that the market value of the shares has

4

deceased. The short seller nets a profit of $10 per share. If, on the other hand, the price has risen to $120 at the expiration date, the short seller will be obligated to buy the share at that price, and he will lose $20 per share.

22. Prior to the financial crisis in 2008, investors could engage in "naked" short-selling, which is the practice of short-selling a tradeable asset without first borrowing the security. Currently, however, shares must be borrowed in order for a short sale to take place.

23. This borrowing of shares is facilitated by the brokerage firm; the borrowed shares may come from another investor's account, from shares being held in the brokerage firm's inventory, or even from another brokerage firm (through inter-brokerage firm lending arrangements). Regardless of the where the shares come from, however, the brokerage firm technically is the lender.

24. Because the brokerage firm is making a loan (in the form of stock) to the short seller, it requires collateral. This collateral is derived in part from the proceeds of the short sale (the sale of the borrowed stock to another investor). The brokerage firm withholds these proceeds rather than distributing them to the short seller and utilizes them to secure the loan. By regulation (Regulation T), a short sale must be collateralized by the short sale proceeds plus an additional margin requirement of 50% of the value of the short sale.

25. The brokerage firm typically charges a transaction fee for facilitating a short sale, and also charges interest on the loan for as long as it remains outstanding (i.e., as long as the stock remains loaned out and has not been replaced or "covered"). A typical interest rate is U.S. prime rate plus 2%.

26.     It is typical for a brokerage firm to borrow shares from another investor's account to facilitate a short sale. This is allowed by the brokerage account agreement.

27.     Where shares are loaned out of an investor's account, the accountholder loses the voting rights associated with those shares as well as any dividends that were payable during the time the loan was outstanding. In the case of bonds and bond funds, the accountholder loses the right to receive interest or tax exempt interest dividends.

28.     Brokerage firms typically attempt to make up for lost dividends and interest with substitute payments to the account owner. Importantly, these substitute payments are not dividends or interest, they are monetary payments in lieu of the dividends or interest the accountholder otherwise would have received for the shares he or she owned.

29.     There is a specific line for these substitute payments on IRS Form 1099-MISC– Line 8, "Substitute Payments in Lieu of Dividends or Interest." This is where the brokerage firm reports substitute payments the accountholder received instead of receiving dividends or tax-exempt interest.

30.     Brokerage firms are only required to report substitute payments of $10 or more, but regardless of whether the substitute payments meet the minimum threshold to be reported to the IRS by the brokerage firm, they must be reported to the IRS by the taxpayer. All income must be reported.

31.     There is an important distinction between substitute payments and dividends and interest. Substitute payments are taxed as ordinary income at rates that can be as high as 37% depending on the taxpayer. Qualifying dividends, on the other hand, are taxed at a maximum rate of 20%.

32.     This difference in tax treatment makes substitute payments less valuable than qualifying dividends. By way of example, assume a brokerage firm borrowed 10 shares of

ABC Company from an account owner and lent those 10 shares to a short seller for one year. During that year, ABC Company paid $1 in dividends for each outstanding share. Instead of receiving those dividends, the investor received $1 in "substitute payments in lieu of dividends." If the investor's other ordinary income qualifies them for the highest income tax bracket, they will pay 37 cents in income taxes on every $1 in substitute payments. In sharp contrast, they only would have paid 20 cents in income tax on each $1 in qualifying dividends. They lost 17 cents on every share. Stated another way, in this example, the account owner lost 17% of the profit they would have received on dividend income.

33.     Some brokerage firms attempt to compensate for this difference in tax treatment by providing an annual credit to the account owner.  This credit typically is calculated based on a predetermined formula which replicates the account owners' additional tax liability.  The credit typically is reported as "Other income" on line 3 of IRS Form 1099-MISC.

*TD Ameritrade*

34.     Plaintiff and the class own brokerage accounts at TD Ameritrade.

35.     These accounts are governed in part by the TD Ameritrade Client Agreement.

36.     The TD Ameritrade Client Agreement, in turn, defines the parties' agreement to include the "terms and conditions" of the TD Ameritrade Client Agreement, "as well as any supplemental agreements and disclosures that apply to [the accountholder's] account."

37.     The TD Ameritrade Margin Handbook embodies "disclosures that apply to [the accountholder's] account" and is therefore part of the parties' agreement.

38.     Together, the TD Ameritrade Client Agreement and the TD Ameritrade Margin Handbook  govern the use of the brokerage accounts, transactions in those accounts,

7

TD Ameritrade websites, and the content therein. A copy of the TD Ameritrade Institutional Client Agreement is attached as Exhibit A and a copy of the Margin Handbook is attached as Exhibit B.

39.     TD Ameritrade pledged, repledged, hypothecated or rehypothecated securities during the class period and as a result of those activities, it made substitute payments in lieu of the dividends and/or interest that Plaintiff and the class otherwise would have received.

40.     In the TD Ameritrade Margin Handbook, in the "substitute payments" section, TD Ameritrade provides background about the tax consequences of receiving substitute payments in lieu of dividends and promises investors that they will not be negatively affected:

> In May 2003, the Jobs and Growth Reconciliation Act of 2003 was signed into law. The new act includes a reduced tax rate on "qualified dividends" paid by corporate issuers. Qualified dividend income will be taxed at the long-term capital gains rate (generally 20%) rather than the ordinary rate (37% maximum) as long as you satisfy a 60-day holding period.

> On February 19, 2004, the IRS accounted the acceptance of the Technical Corrections Bill. To qualify for the lower tax rates, the taxpayer must now hold the dividend-paying stock for at least 61 days during the 121-day period beginning 60 days before the ex-dividend date – the first date the buyer will not be entitled to receive that dividend.

> There are also situations where investors receive "payments in lieu" of dividends on stocks a broker has borrowed as part of its securities lending practices, that do not qualify for the reduced rate. **As TD Ameritrade, Inc. may borrow your dividend-paying stock in the normal course of business, you may receive a "payment in lieu" of dividends instead of a qualifying dividend. Should this occur, TD Ameritrade, Inc. will compensate your account, at its discretion, the difference between the long-term capital gains rate of 20% and the maximum 37% ordinary rate. We will also include the additional tax due on the difference (or a "gross-up"). We will calculate the gross-up as the difference between the 37% ordinary rate and the 20% capital gains rate divided by 63% - resulting in a premium payment of 26.9841% on the "payment in lieu."**

41. For anyone who receives "payments in lieu" of qualified dividends, TD Ameritrade promises that it will make up the difference between the long-term capital gains tax rate and the ordinary income tax rate and also promises, without qualification, that it will make a "gross-up" payment that include the additional tax on the difference, resulting in a premium payment of 26.9841% on the "payment in lieu." This collectively is known as a "premium payment."

42. TD Ameritrade failed and continues to fail to make a premium payment to all accountholders contractually entitled to received one.

43. This failure happens because TD Ameritrade has an automated process for making premium payments, but the automated process only examines how a dividend is characterized by the issuer at the time the dividend is paid, to determine whether it is characterized as a "qualified" or an "ordinary" dividend. ("Ordinary" dividends are dividends that do not meet the IRS criteria to qualify for preferential tax treatment.) If a dividend is characterized as ordinary at the time of payment, TD Ameritrade treats it as an ordinary dividend, and does not make a premium payment to the accountholder's account to compensate for the tax difference between the dividend and a substitute payment (because in the case of an ordinary dividend, there is no tax difference).

44. The problem is that dividends often are recharacterized after the time of payment; ordinary dividends become qualified dividends. TD Ameritrade's automated process does not account for this recharacterization. As a result, scores of accountholders who should have received a premium payment did not get one.

## Class Action Allegations

45. Plaintiff brings this action pursuant to Fed.R.Civ.P. 23(b)(2) & (3).

9

46. Plaintiff brings this action on behalf of himself and all TD Ameritrade accountholders who, during the time period February 19, 2010 through the present, received a substitute payment lieu of a qualifying dividend without also receiving a premium payment. Excluded from the class are all judicial officers presiding over this or any related case. The class definition also excludes all shareholders, officers and employees of TD Ameritrade. Plaintiff reserves the right to modify this class definition as discovery or other case circumstances warrant.

47. Although the exact number of class members is presently unknown, Plaintiff alleges the class as presently defined will number in the thousands if not tens of thousands.

48. There are questions of law and/or fact common to the Plaintiff and the class members, including but not limited to:

    a. Whether TD Ameritrade was contractually obligated to avoid causing accountholders losses through its pledging, repledging, hypothecation, and/or rehypothecation activities; and

    b. Whether TD Ameritrade is contractually obligated to make a premium payment to all accountholders who received a substitute payments in lieu of qualifying dividends; and

    c. Whether TD Ameritrade is contractually authorized to make a substitute payment in situations where it has not borrowed securities from an accountholder's account; and

    d. Whether TD Ameritrade pledges, repledges, hypothecates or rehypothecates securities within the meaning of the TD Ameritrade Account Agreement when it selects securities to serve as collateral for

10

an accountholder's margin borrowing and/or when it loans an accountholder's shares to a short seller.

49. Plaintiff's claims are typical of the claims of the class in that Plaintiff, like all the absent class members, received substitute payments in lieu of qualifying dividends and failed to receive a premium payment to compensate for the fact that substitute payments are taxed as ordinary income.

50. Plaintiff is a member of the class he seeks to represent.

51. Plaintiff is an adequate class representative in that, as a member of the class, his interests are aligned with those of the class.

52. There are no individual conflicts that would prevent Plaintiff from adequately representing the class.

53. Plaintiff has retained competent counsel experienced in class action litigation.

54. Class certification is proper because common questions of fact and law predominate over questions that may affect only individual members of the class.

55. A class action presents a superior form of adjudication over individual litigation.

56. The costs of litigating this action against TD Ameritrade, in comparison to the recovery or relief sought, would make individual litigation impracticable. In addition, forcing individual litigation would risk the result of inconsistent rulings.

57. This class action is manageable. The proposed class represents an identifiable community that can be readily identified, and the relief sought is one that can be overseen by this Court.

## CAUSES OF ACTION

### COUNT I:  Breach of Contract
### (Losses Resulting from Pledging, Repledging, Hypothecation and/or Rehypothecation)

58.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

59.     Each member of the putative class entered into a TD Ameritrade Client Agreement with TD Ameritrade.

60.     The TD Ameritrade Client Agreement provides in pertinent part:

g. Pledge of Securities and Other Property. You may pledge, repledge, hypothecate, or re-hypothecate, without notice to me, all securities and other property that you hold, carry, or maintain in or for any of my margin or short Accounts. You may do so without retaining in your possession or under your control for delivery the same amount of similar securities or other property. The value of the securities and other property that you may pledge, repledge, hypothecate, or re-hypothecate may be greater than the amount I owe you, and **any losses**, gains or compensation **that result from these activities will not accrue to my Account.**"

61.     TD Ameritrade promised account owners that they would not suffer any losses from TD Ameritrade's pledging, repledging, hypothecation, and/or re-hypothecation activities.

62.     TD Ameritrade failed to honor this promise.  Account owners did suffer losses from the foregoing activities.  Account owners received substitute payments in lieu of qualifying dividends and/or tax-exempt interest.  Substitute payments are less valuable than qualifying dividends because they are taxed as ordinary income rather than capital gains.

63.     By causing and allowing account owners to suffer losses from TD Ameritrade's pledging, repledging, hypothecation, and/or re-hypothecation activities, TD Ameritrade breached the TD Ameritrade Client Agreement.

64.    As a result of this breach, Plaintiff and the class suffered damages in an amount to be determined at trial.

## COUNT II:  Breach of Contract
**(Failure to Make Premium Payment)**

65.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

66.    Each member of the putative class entered into TD Ameritrade Client Agreement with TD Ameritrade.

67.    The TD Ameritrade Client Agreement defines the parties' agreement to include the "terms and conditions" of the TD Ameritrade Client Agreement, "as well as any supplemental agreements and disclosures that apply to [the accountholder's] account."

68.    The TD Ameritrade Margin Handbook embodies "disclosures that apply to [the accountholder's] account" and is therefore part of the parties' agreement.

69.    The Margin Handbook provides background information about tax consequences of receiving substitute payments in lieu of dividends, but promises investors that they will not be negatively affected:

> In May 2003, the Jobs and Growth Reconciliation Act of 2003 was signed into law. The new act includes a reduced tax rate on "qualified dividends" paid by corporate issuers. Qualified dividend income will be taxed at the long-term capital gains rate (generally 20%) rather than the ordinary rate (37% maximum) as long as you satisfy a 60-day holding period.

> On February 19, 2004, the IRS accounted the acceptance of the Technical Corrections Bill. To qualify for the lower tax rates, the taxpayer must now hold the dividend-paying stock for at least 61 days during the 121-day period beginning 60 days before the ex-dividend date – the first date the buyer will not be entitled to receive that dividend.

> There are also situations where investors receive "payments in lieu" of dividends on stocks a broker has borrowed as part of its securities lending practices, that do not qualify for the reduced rate. **As TD Ameritrade, Inc. may borrow your dividend-paying stock in the normal course of**

**business, you may receive a "payment in lieu" of dividends instead of a qualifying dividend. Should this occur, TD Ameritrade, Inc. will compensate your account, at its discretion, the difference between the long-term capital gains rate of 20% and the maximum 37% ordinary rate. We will also include the additional tax due on the difference (or a "gross-up"). We will calculate the gross-up as the difference between the 37% ordinary rate and the 20% capital gains rate divided by 63% - resulting in a premium payment of 26.9841% on the "payment in lieu."**

70.     TD Ameritrade promised class members that if they received a substitute payment in lieu of a qualifying dividend, they also would receive compensation to offset the difference between maximum ordinary income tax rate applicable to substitute payments and the maximum long-term capital gains rate applicable to qualifying dividends, as well as a "gross up" to offset the additional tax due on the difference.   TD Ameritrade refers to this as a "premium payment."

71.     TD Ameritrade has discretion as to when to make the premium payment, but does not have discretion as to whether the premium payment must be made.  If class members receive a substitute payment in lieu of qualifying dividends, they are contractually entitled to a premium payment.

72.     TD Ameritrade breached the parties' agreements by failing to make premium payments to all class members who received a substitute payment in lieu of qualifying dividends.

73.     As a result of this breach, Plaintiff and the class suffered damages in an amount to be determined at trial.

<u>**COUNT III:  Breach of Contract**</u>
**(Substitute Payments When Securities Were Not Borrowed/Loaned)**

74.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

14

75.     Each member of the putative class entered into a TD Ameritrade Client Agreement with TD Ameritrade.

76.     The TD Ameritrade Client provides in pertinent part:

h. Loan of Securities. You are authorized to lend to yourself or others any securities you hold in my Account and to carry all securities lent as general loans. In connection with such loans, you may receive compensation and retain certain benefits that I will not be entitled to, such as interest on Collateral posted for such loans. In certain circumstances, such loans may limit my ability to exercise voting rights with respect to the securities lent. I may request that fully paid securities not be used in connection with short sales. **I understand that in certain situations in which you have borrowed my securities, I may receive a "payment in lieu" of the dividend issued**.

77.     Under this provision, TD Ameritrade is authorized to make a substitute payment in lieu of dividends to an accountholder if TD Ameritrade borrows the accountholder's securities.

78.     The TD Ameritrade Margin Handbook similarly states:

There are also situations where investors receive "payments in lieu" of dividends on stocks a broker has borrowed as part of its securities lending practices, that do not qualify for the reduced rate. **As TD Ameritrade, Inc. may borrow your dividend-paying stock in the normal course of business, you may receive a "payment in lieu" of dividends instead of a qualifying dividend.** Should this occur, TD Ameritrade, Inc. will compensate your account, at its discretion, the difference between the long-term capital gains rate of 20% and the maximum 37% ordinary rate. We will also include the additional tax due on the difference (or a "gross-up"). We will calculate the gross-up as the difference between the 37% ordinary rate and the 20% capital gains rate divided by 63% - resulting in a premium payment of 26.9841% on the "payment in lieu."

79.     TD Ameritrade is not authorized to make a substitute payment in lieu of dividends to an accountholder if TD Ameritrade does not borrow the accountholder's securities.

80.     Indeed, there is no reason for TD Ameritrade to make a substitute payment in lieu of dividends to an accountholder if TD Ameritrade does not borrow the

accountholder's securities, because if the securities are not borrowed, the dividends associated with those securities need not be paid to anyone other than the accountholder.

81.    Notwithstanding the foregoing, TD Ameritrade has taken the position that in certain situations, TD Ameritrade makes substitute payments to accountholders even where it does not borrow the accountholder's securities.  TD Ameritrade alleges this occurred with Plaintiff.

82.    To the extent TD Ameritrade made substitute payments to accountholders where it did not borrow the accountholder's securities, it did so without authorization and in breach of the parties' contract.

83.    Plaintiff and the class have been damaged as a result of this breach in an amount to be determined at trial.  Among other things, they received substitute payments taxed as ordinary income in lieu of qualifying dividends taxed as capital gains.

## COUNT IV:  Declaratory Judgment

84.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

85.    An actual and justiciable controversy exists between Plaintiff and TD Ameritrade concerning TD Ameritrade's rights and obligations when it makes a substitute payment in lieu of dividends.

86.    Plaintiff maintains as follows:

    a.    TD Ameritrade can only make a substitute payment in lieu of dividends in situations where it has borrowed an accountholder's securities; and

    b.    Whenever TD Ameritrade makes a substitute payment in lieu of qualifying dividends, it must compensate the accountholder for the

difference between the between maximum ordinary income tax rate applicable to substitute payments and the maximum long-term capital gains rate applicable to qualifying dividends, and provide a "gross up" to offset the additional tax due on the difference.

87.     TD Ameritrade maintains as follows:

    a.     TD Ameritrade can make a substitute payment in lieu of dividends even in situations where it has not borrowed an accountholder's securities; and

    b.     Unless the dividend is characterized as a qualifying dividend at the time of payment, TD Ameritrade need not compensate the accountholder for the difference between the between maximum ordinary income tax rate applicable to substitute payments and the maximum long-term capital gains rate applicable to qualifying dividends, and provide a "gross up" to offset the additional tax due on the difference.

88.     Plaintiff and the class are entitled to a declaration clarifying TD Ameritrade's rights and obligations so that, going forward, they know what payments to expect (or not expect) related to their margin accounts.

### COUNT V:  Unjust Enrichment

89.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

90.     If it is determined that TD Ameritrade did not have a contractual obligation to make a premium payment to accountholders to cover the additional expense accountholders incurred as a result of shares being borrowed and loaned out of their

17

accounts, then TD Ameritrade was unjustly enriched by failing to make this premium payment.

91. TD Ameritrade received a benefit from class members by being able to borrow and loan out shares from their and to make substitute payments to accountholders in lieu of qualified dividends.

92. TD Ameritrade knew about and appreciated that benefit.

93. TD Ameritrade accepted and retained this benefit under such circumstances as to make it inequitable for TD Ameritrade to retain the benefit without payment of its value.

94. Plaintiff and the class seek equitable relief in the form of an Order requiring TD Ameritrade to pay them the value of this benefit as measured by the difference between the between maximum ordinary income tax rate applicable to substitute payments and the maximum long-term capital gains rate applicable to qualifying dividends.

## PRAYER FOR RELIEF

Plaintiff and the class pray for judgment in their favor as follows:

A. An Order certifying Plaintiff's claims for class action treatment under Fed.R.Civ.P. 23(b)(3) and/or Fed.R.Civ.P. 23(b)(2);

B. Judgment in favor of Plaintiff and the class on the claim that TD Ameritrade breached the TD Ameritrade Client Agreement by engaging in pledging, repledging, hypothecation, and/or re-hypothecation activities that caused accountholders to suffer losses.

C. Judgment in favor of Plaintiff and the class on the claim that TD Ameritrade breached the TD Ameritrade Client Agreement, incorporating the TD Ameritrade Margin Handbook, by failing to make a premium payment to all

class members who received a substitute payment in lieu of qualifying dividends;

D.     Judgment in favor of Plaintiff and the class on the claim that TD Ameritrade made a substitute payment to class members in situations where it did not borrow and loan out class members' securities;

E.     Declaratory judgment in favor of the claim for Plaintiff and the class that TD Ameritrade can only make a substitute payment to accountholders in situations where it borrows and loans out their securities;

F.     Declaratory judgment in favor of the claim for Plaintiff and the class that TD Ameritrade must make a premium payment to accountholders whenever it makes a substitute payment in lieu of qualifying dividends;

G.     Judgment in favor of Plaintiff and the class on the claim that TD Ameritrade was unjustly enriched by retaining the benefit of borrowing and loaning out securities from class members' accounts without making a premium payment to them to cover the additional expense they incurred;

H.     An award of damages in an amount to be determined at trial;

I.     An award of equitable relief as appropriate for the claims asserted, as measured by the difference between the between maximum ordinary income tax rate applicable to substitute payments and the maximum long-term capital gains rate applicable to qualifying dividends;

J.     An award of the reasonable costs and attorney's fees Plaintiff and the class incurred in bringing this action; and

K.     Such other relief as the Court deems just and proper.

19

## DEMAND FOR JURY TRIAL

Plaintiff and the class hereby demand trial by jury on all issues so triable.

Respectfully Submitted,

BARTLE & MARCUS LLC

By /s/David L. Marcus
    David L. Marcus, MO Bar #47846
    BARTLE & MARCUS LLC
    116 W. 47th Street, Suite 200
    Kansas City, MO 64112
    Telephone: 816.256.4699
    Fax: 816.222.0534
    Dmarcus@bmlawkc.com

    and

THE LAW OFFICE OF JARED A. ROSE

    Jared A. Rose, MO Bar #60128
    919 West 47th Street
    Kansas City, MO 64112
    Phone: 816.221.4335
    Fax: 816.873.5406
    jared@roselawkc.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on March 31, 2021, I served a copy of the foregoing document via this Court's CM/ECF System to the following:

Jason M. Hans
GERMAN MAY PC
1201 Walnut Street, 20th Floor
Kansas City, MO 64106
jasonh@germanmay.com

Stephen G. Topetzes
Theodore L. Kornobis
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Stephen.topetzes@klgates.com
Ted.kornobis@klgates.com

*Attorneys for Defendants*

David S. Marcus
/s/
*Attorney for Plaintiff*
